No. 25-10088

===

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

===

**UNITED STATES OF AMERICA,**
                                                *Plaintiff-Appellee,*

**v.**

**JESSE RANCE MOORE**
                                        *Defendant-Appellant.*

_____

A Direct Appeal of a Criminal Case
From the United States District Court
for the Northern District of Florida, Gainesville Division

_____

<u>**INITIAL BRIEF OF APPELLANT**</u>

JOSEPH DEBELDER
Federal Public Defender

STACEY NILES KIME
Assistant Federal Public Defender
Florida Bar No. 0095211
227 N. Bronough Street, Ste. 4200
Tallahassee, Florida 32301
Telephone: (850) 942-8818
FAX: (850) 942-8809
Stacey_kime@fd.org
Attorney for Appellant

United States v. Jesse Rance Moore

## APPELLANT'S CERTIFICATE OF INTERESTED PERSONS

As required by Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-2, the following persons have an interest in the outcome of this case:

Byron, David, Assistant United States Attorney

DeBelder, Joseph, Federal Public Defender

Ferguson, Harley, Assistant United States Attorney

Heekin, John, United States Attorney

Hatfield, III, Anderson, CJA Appointed Defense Counsel

Johnson, Darren, Assistant Federal Public Defender

Kime, Stacey Niles, Assistant Federal Public Defender

Lowry, Midori A., United States Magistrate Judge

McCain, James, Assistant United States Attorney

Milligan, Gary, Assistant United States Attorney

Moore, Jesse, Defendant/Appellant

Williams, Francis, Assistant United States Attorney

Winsor, Allen C., United States District Judge

**STATEMENT REGARDING ORAL ARGUMENT**

Appellant, Jesse Rance Moore, defers to the Court on whether oral argument would be helpful to the just resolution of this appeal.

# TABLE OF CONTENTS

Contents          Page

APPELLANT'S CERTIFICATE OF INTERESTED PERSONS.................C1of1

STATEMENT REGARDING ORAL ARGUMENT ............................................i

TABLE OF CONTENTS ...........................................................................ii

TABLE OF CITATIONS ...........................................................................v

STATEMENT OF JURISDICTION ...............................................................1

STATEMENT OF THE ISSUES ..................................................................2

STATEMENT OF THE CASE ....................................................................3

   (i)    Course of Proceedings and Dispositions in the Court Below......................3

   (ii)   Statement of the Facts.............................................................3

      1.    Moore moved to suppress all evidence under the Fourth Amendment. ...................................................................4

      2.    Moore moved to Dismiss on Second Amendment Grounds ...................8

      3.    Shortly before trial, Moore discharged appointed counsel. .....................9

      4.   The district court denied Moore's motion to subpoena defense witnesses. ...................................................................10

      5.    The Jury Trial .............................................................. 11

      6.    Motion for New Trial .................................................... 15

      7.    Sentencing ................................................................. 19

   (iii)   Standards of Review .............................................................20

SUMMARY OF THE ARGUMENT ..............................................................22

ARGUMENTS .....................................................................................25

   Issue one ........................................................................................25

   The district court reversibly erred in denying the motion for new trial. .........25

Issue two ...................................................................................30

    The court erred in denying Moore's motion to subpoena witnesses
    (ECF 87). The denial violated Rule 17 and Moore's constitutional rights
    to due process, to compel witnesses, and to present a defense.......................30

Issue three...............................................................................35

    The district court reversibly erred in allowing Moore to represent
    himself without ensuring his Sixth Amendment waiver of counsel was
    voluntary. ................................................................................35

    A.    To voluntarily waive the Sixth Amendment right to counsel, the
    defendant must be aware of his right to *competent* counsel. ............35

    B.    Moore's waiver of sentencing counsel was not voluntary. ...................39

    C.    Moore's waiver of trial counsel was not voluntary................................40

Issue four .................................................................................42

    The district court erred in denying Moore's motion to suppress without
    an evidentiary hearing. ..................................................................42

    A.    During the initial investigation, police conducted a warrantless
    search and seizure in violation of the Fourth Amendment............................42

    B.    The court should have granted suppression, or, at the very least,
    held an evidentiary hearing..............................................................45

        1. Under *Franks* and *Murray*, the district court erred in deciding
        that, excluding any information gained by Elliott's seizure of Moore
        and trespassory search of his real property and trailer, there was still
        PC to support a search warrant for the Moore house. ...............................45

        2. The district court erred in applying *Murray*...........................................48

    C.    Moore's motions were neither time-barred nor estopped.....................50

Issue five .................................................................................53

    The NFA .................................................................................53

    A.    Regulations that restrict presumptively-protected conduct must
    be consistent with the country's historical tradition. .....................................53

    B.    The Second Amendment's "plain text" covers Moore's conduct. .......54

C.    The Government cannot show a historical tradition of requiring pre-possession registration of short-barrel rifles. ............................................ 57

CONCLUSION.................................................................................... 59

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS................................................................................ 60

CERTIFICATE OF SERVICE.......................................................... 61

# TABLE OF CITATIONS

Page(s)

Cases

*Carpenter v. United States,*
  138 S. Ct. 2206 (2018) ....................................................................45
*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ..................................................... 9, 53, 54, 55, 56
*\*Faretta v. California,*
  422 U.S. 806 (1975) ...................................... 6, 19, 23, 35, 38, 39, 40
*Fernandez v. United States,*
  941 F.2d 1488 (11th Cir. 1991) .....................................................50
*Florida v. Jardines,*
  569 U.S. 1 (2013) ...........................................................................45
*\*Franks v. Delaware,*
  438 U.S. 154 (1978) .......................................................21, 23, 45, 46
*Heller v. District of Columbia,*
  670 F.3d 1244 (D.C. Cir. 2011) .....................................................55
*Holmes v. South Carolina,*
  547 U.S. 319 (2006) .......................................................................32
*Maynard v. Meachum,*
  545 F.2d 273 (1st Cir. 1976) ........................................... 36, 37, 38, 39
*McDonough Power Equip., Inc. v. Greenwood,*
  464 U.S. 548 (1984) .................................................................. 25, 27
*\*Murray v. United States,*
  487 U.S. 533 (1988) ................................................... 23, 45, 48, 49
*\*New York State Rifle & Pistol Ass'n. v. Bruen,*
  597 U.S. 1 (2022) ......................................................... 8, 9, 53, 57
*NLRB v. Noel Canning,*
  573 U.S. 513 .................................................................................53
*Oliver v. United States,*
  466 U.S. 170 (1984) ...................................................................... 44
*Payton v. New York,*
  445 U.S. 573 (1980) ...................................................................... 42

v

*Pazden v. Maurer*,
424 F.3d 303 (3d Cir. 2005) ...............................................36, 38, 39

*Penson v. Ohio*,
488 U.S. 75 (1988) ...................................................... 40, 41

*Sanchez v. Mondragon*,
858 F.2d 1462 (10th Cir. 1988).....................35, 36, 37, 38, 41

*Smith v. Phillips*,
455 U.S. 209 (1982) ...........................................................25

*Strozier v. Newsome*,
926 F.2d 1100 (11th Cir. 1991) .......................................35

*Terry v. Ohio*,
392 U.S. 1 (1968) ........................................................... 42

*United States v. Albury*,
782 F.3d 1285 (11th Cir. 2015)........................................49

*United States v. Bailey*,
468 F.2d 652 (5th Cir. 1972)...................................... 26, 27

*United States v. Barron-Soto*,
820 F.3d 409 (11th Cir. 2016)..........................................49

*United States v. Bolatete*,
977 F.3d 1022 (11th Cir. 2020) .......................................21

*United States v. Bolinger*,
837 F.2d 43 (11th Cir. 1988) ...............................25, 26, 27

*United States v. Cash*,
47 F.3d 1083 (11th Cir. 1995) .........................................36

*United States v. Chaves*,
169 F.3d 687 (11th Cir. 1999) ....................................48, 49

*United States v. Curry*,
760 F.2d 1079 (11th Cir. 1985).........................................1

*United States v. Drayton*,
536 U.S. 194 (2002) ....................................................... 42

*United States v. Edwards*,
469 F.2d 1362, 1369 (5th Cir. 1972) ...............................32

*United States v. Gallardo-Mendez*,
150 F.3d 1240 (10th Cir. 1998) .......................................51

*United States v. Gibbs*,
917 F.3d 1289 (11th Cir. 2019) .......................................43

vi

*United States v. Goldstein,*
  989 F.3d 1178 (11th Cir. 2021) .................................................. 21
*United States v. Gonzalez,*
  190 F.3d 668 (5th Cir. 1999) .................................................... 44
*United States v. Harnage,*
  976 F.2d 633 (11th Cir. 1992) ...................................................50
*United States v. Jesse Moore,* No. 24-10447 ............................... 2
*United States v. Jiminez-Shilon,*
  34 F.4th 1042 (11th Cir. 2022) ..................................................54
*United States v. Jones,*
  565 U.S. 400 (2012) ................................................................45
*United States v. Jones,*
  597 F.2d 485 (5th Cir. 1979) ....................................................26
*United States v. Kapordelis,*
  569 F.3d 1291 (11th Cir. 2009) .................................................46
*United States v. Kimball,*
  291 F.3d 726 (11th Cir. 2002) .................................................. 20
*United States v. Knights,*
  989 F.3d 1281 (11th Cir. 2021) ................................................ 42
*United States v. Matchett,*
  802 F.3d 1185 (11th Cir. 2015) ................................................ 20
*United States v. Miller,*
  307 U.S. 174 (1939) .................................................9, 24, 55, 56
*United States v. Muho,*
  978 F.3d 1212, 1219 (11th Cir. 2020) ........................................ 20
*United States v. Nell,*
  526 F.2d 1223 (5th Cir. 1976) ........................................ 26, 27, 28
*United States v. Noriega,*
  676 F.3d 1252 (11th Cir. 2012).............................................48, 49
*United States v. Pelullo,*
  14 F.3d 881 (3d Cir. 1994) .......................................................51
*United States v. Perkins,*
  748 F.2d 1519 (11th Cir. 1984)............................20, 25, 26, 27, 28
*United States v. Rahimi,*
  602 U.S. 680 (2024)................................................................54
*United States v. Rinchack,*

820 F.2d 1557, 1566 (11th Cir. 1987) ........................................ 20, 30

*United States v. Silkwood*,
    893 F.2d 245 (10th Cir. 1989) .......................................... 36, 37, 40

*United States v. Stanley*,
    739 F.3d 633 (11th Cir. 1991) ................................................. 36

*United States v. Taylor*,
    113 F.3d 1136 (10th Cir. 1997) ............................................... 36

*United States v. Tutt*,
    704 F.2d 1567 ...................................................................... 27

*Washington v. Texas*,
    388 U.S. 14 (1967) ......................................................... 31, 32

*Wilks v. Israel*,
    627 F.2d 32 (7th Cir. 1980) .................................................. 36

*Wong Sun v. United States*,
    371 U.S. 471 (1963) ............................................................ 42

## Statutes

18 U.S.C. § 3231 ....................................................................... 1
28 U.S.C. § 1291 ....................................................................... 1

## Rules

Fed. R. App. P. 32(a)(5) ........................................................... 60
Fed. R. App. P. 32(a)(6) ........................................................... 60
Fed. R. App. P. 32(a)(7)(B) ....................................................... 60
Fed. R. Crim. Pro. 17 ............................................................... 30
Fed. R. Crim. Pro. 17(b) ............................................. 2, 20, 30, 31, 32
Fed. R. Crim. Pro. 33 ............................................................... 26

## Other Authorities

Charles M. Kneier, *Territorial Jurisdiction of Local Law Enforcement Officers*,
    9 N.C. L. Rev. 283 (1931) ............................................... 43, 44
Oliver Krawczyk, *Dangerous and Unusual: How an Expanding National Firearms Act Will Spell Its Own Demise*,
    127 Dick. L. Rev. 273 (2022) ............................................ 54, 55

James A. D'Cruz, *Half-Cocked: The Regulatory Framework of Short-Barrel Firearms*, 40 Harv. J. L. & Pub. Pol'y 493 (2017) ..............................................................56

National Firearm's Act (NFA) ....................................................2, 24, 53, 54, 57, 58

The American Revolution Institute, *Blunderbuss, the "Thunder Box" of the Battlefield*, https://www.americanrevolutioninstitute.org/recent-acquisitions/english-blunderbuss/ (last viewed May 29, 2025) ........................57

U.S. Const. Amend. Two........................................ 2, 8, 9, 24, 53, 54, 55, 56, 57, 58

U.S. Const. Amend. Four .................................... 2, 4, 5, 6, 23, 42, 43, 44, 45, 51, 52

U.S. Const. Amend. Six .............................................. 2, 25, 31, 32, 35, 40

# STATEMENT OF JURISDICTION

The United States District Court, Northern District of Florida, Gainesville Division, had jurisdiction pursuant to 18 U.S.C. § 3231. Following a jury trial, the district court orally imposed judgment and sentence on January 7, 2025, and entered written judgment and sentence on January 10, 2025. ECF 125, 140. Seeking relief from that final judgment, Jesse Moore filed a notice of appeal on January 8, 2025. ECF 123.[1] This Court has jurisdiction pursuant to 28 U.S.C. § 1291, which provides that the courts of appeals possess jurisdiction of appeals from all final decisions of the district courts of the United States except where a direct review may be taken to the Supreme Court.

---

[1] *United States v. Curry*, 760 F.2d 1079, 1079-80 (11th Cir. 1985) (premature notice of appeal is effective to perfect appeal as of the date sentence is entered as judgment).

# STATEMENT OF THE ISSUES

### Issue one:

The district court reversibly erred in denying the motion for new trial.

### Issue two:

The court erred in denying Moore's motion to subpoena witnesses (ECF 87). The denial violated Rule 17 and Moore's constitutional rights to due process, to compel witnesses, and to present a defense.

### Issue three:

The district court reversibly erred in allowing Moore to represent himself without ensuring his Sixth Amendment waiver of counsel was voluntary.

### Issue four:

The district court erred in denying Moore's motions to suppress without an evidentiary hearing.[2]

### Issue five:

The NFA violates the Second Amendment.

---

[2] A related Fourth Amendment issue is pending before the Court in *United States v. Jesse Moore*, No. 24-10447.

# STATEMENT OF THE CASE

(i)      Course of Proceedings and Dispositions in the Court Below

The Government charged Appellant, Jesse Rance Moore, by Indictment, with possessing an unregistered firearm. ECF 1. The offense date was June 27, 2022. *Id.* The allegation surrounded three firearms stored in Moore's home, which the Government alleged were short-barrel rifles. *Id.*

Before trial, Moore filed motions to suppress evidence on Fourth Amendment grounds, and to dismiss the charge on Second Amendment grounds. ECF 19, 34, 68, 72, 81, 83, 83-1. The motions were denied, and the case proceeded to trial. ECF 44, 46, 74, 88. The jury found Moore guilty as charged. ECF 101. Moore filed a motion for new trial, contending a seated juror was actually biased against him due to an altercation they had which preceded the trial. ECF 105, 110, 117. The motion was denied. ECF 107, 119.

At sentencing, the guidelines range was 51-63 months' imprisonment. ECF 126. The district court varied downwards, imposing 36-months' imprisonment plus three-years' supervised release. ECF 125. Moore filed a notice of appeal. ECF 127.

(ii)      Statement of the Facts

On June 27, 2022, authorities executed a search warrant at Moore's residence. They observed numerous firearms, three of which were allegedly unlawful because Moore had not paid the registration tax for a short-barrel rifle. The Indictment alleged a single count of possessing an unregistered firearm.

The warrant was issued because Moore was suspected of four pharmacy robberies, offenses for which Moore was later convicted in the Middle District of Florida and sentenced to 21-years' imprisonment. ECF 113, p. 6-7. Moore resides in the Northern District of Florida, where the firearms were discovered, and this appeal originated.

## 1. Moore moved to suppress all evidence under the Fourth Amendment.

Through counsel, Moore moved to suppress evidence on Fourth Amendment grounds. ECF 19. The motion alleged Moore's prosecution stemmed from an unlawful search and seizure. *Id.* On January 13, 2022, a Columbia County deputy stopped Moore's car and gathered evidence in Suwannee County, thereby conducting a search and seizure outside his jurisdiction in contravention of the Fourth Amendment. *Id.* at p. 3. The deputy allegedly saw a roadside argument between Moore and a female; he "pulled in catty-corner to the vehicle," "activated the flashing police lights on his vehicle," and investigated while visibly

armed and clothed in police insignia. *Id.* at p. 2-3. Moore contended that the initial

encounter violated the Fourth Amendment. *Id.* at p. 8-9.

The deputy left the area to investigate an armed robbery, and the deputy

learned Moore allegedly matched the description of the robber. One hour later, five

deputies from Columbia County trespassed on land owned by Moore and found a

trailer with a Florida tag, circumventing two "no trespassing" signs on the chain

which blocked the entrance road. ECF 19, p. 3-4. Moore contended this trespassory

behavior also violated the Fourth Amendment. Finally, Moore contended the

ensuing search warrant did not purge the taint, because the affiant omitted details

which demonstrated the initial search's illegality and established that subsequent

steps were fruits of the initial violations. *Id.* at p. 13-14. Importantly, Moore stated

all the alleged omissions were verifiable via the sworn testimony of Deputy Elliott

in a related case from the Middle District. *Id*. The Government filed a response.

ECF 28.

The court denied the motion, finding (1) the initial encounter did not

implicate the Fourth Amendment because the color-of-office doctrine is a creature

of Florida law, (2) the second search did not implicate the Fourth Amendment

because it involved an "open field," and (3) a hearing was unnecessary because the

officers never implicated the Fourth Amendment before seeking a warrant. ECF 44.

Thereafter, Moore's appointed counsel (Hatfield) moved to withdraw due to irreconcilable differences. ECF 47. The court held a hearing on June 24, 2024. ECF 133. Moore initially stated he wanted to represent himself due to difficulties with counsel. *Id.* at p. 2. But during the ensuing *Faretta* colloquy, Moore explained he worried his attorney would not provide adequate assistance, and that he did not want to represent himself: "I mean, I'd rather have somebody." *Id.* at p. 38. The district court inquired into the conflict, found Hatfield was not ineffective, and appointed the Federal Public Defender (attorney Johnson) as substitute counsel. *Id.* at p. 39.

Two days later, the court modified the order at Moore's request, placing Johnson in a standby role. ECF 134, p. 2-5. Moore filed pro se motions to suppress and to reconsider the rulings. ECF 68, 72, 81, 83, 89, 111, 112; *see also* ECF 70, 82 (Government's responses). In the amended pro-se filings, Moore fleshed out accusations which substantiated his claim that the initial encounter with police was a seizure requiring probable cause or reasonable suspicion. ECF 81, p. 3-4; ECF 68, p. 3; ECF 72, p. 1-2.

Moore's amended filings also renewed his request for an evidentiary hearing, detailing facts from the search-warrant affidavit which were either omitted or inaccurate. ECF 72, p. 2; ECF 81, p. 2-12; ECF 83, p. 2-3; ECF 89, p. 1-3. And he submitted voluminous documentation which he alleged supported his contentions the police deliberately lied in their affidavit for a search warrant. ECF 81-1; ECF 72, p. 3-6; ECF 89, p. 4-8.

Broadly, Moore alleged that if fact were corrected or included, the witness descriptions would not *precisely* match his hair or his height (ECF 81-1, p. 6; ECF 89, p. 1; ECF 83, p. 2; ECF 81, p. 5-6), and that witnesses identified the robber as another customer who *does* fit those descriptions (ECF 81, p. 6; ECF 89, p. 1). The vehicle descriptions would only generically describe vehicles associated with Moore, and the tag identified in the BOLO for the fourth robbery did not match anything associated with Moore (although admittedly, it was one digit off from a tag previously registered to Moore). ECF 81, p. 3-7; ECF 81-1, p. 3-4; ECF 81-4, p. 29; ECF 81, p. 2.

Finally, the amended filings explained why these contentions were not included in Moore's initial motion – his attorney failed to include them, and although he ultimately went pro se, he struggles to write quickly due to chronic

injury, struggles which were exacerbated by his pretrial incarceration and delayed access to important discovery. ECF 72, p. 1; ECF 68, p. 5; ECF 81, p. 4-5; ECF 83-1, p. 1-2.[3]

The district court denied Moore's amended suppression motions without an evidentiary hearing, finding they lacked merit and that some claims were untimely under the district court's internal deadlines. ECF 74, 88, 90, 119; ECF 135, p. 7-15. These rulings deeply impacted Moore's demeanor and attitude, and Moore requested counsel; the district court reappointed Johnson as counsel. ECF 135, p. 2, 23-26.

### 2. Moore moved to Dismiss on Second Amendment Grounds

Through counsel, Moore contended his prosecution violated the Second Amendment. ECF 34. Moore was not a convicted felon when the charge arose, and his prosecution and conviction violated the Second Amendment framework articulated in *New York State Rifle & Pistol Ass'n. v. Bruen*, 597 U.S. 1 (2022). ECF 34, p. 2-4. The Government filed a response, citing district-court caselaw

---

[3] Moore reiterated these assertions in post-trial motions, elaborating further about his chronic physical injuries and the computer limitations he faced during pretrial incarceration, which slowed his progress in reviewing evidence and drafting motions. ECF 111, 112; ECF 119 (district court's ruling on post-trial filings).

upholding similar prosecutions against post-*Bruen* Second Amendment challenges. ECF 37. The district court denied the motion, deeming it foreclosed by *United States v. Miller*, 307 U.S. 174 (1939) and *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008). ECF 36, p. 3-4.

### 3. Shortly before trial, Moore discharged appointed counsel.

Attorney Johnson filed a motion to withdraw. ECF 76. At a hearing on the motion, Moore confirmed he was not seeking a different attorney, but rather he wanted to represent himself. ECF 138, p. 2-3, 9. But Moore also indicated his request stemmed from an ongoing "conflict or disagreement" with counsel which "hasn't been resolved." *Id.* at p. 2-3. Rather than exploring Moore's dissatisfaction with counsel, the district court indicated the basis for Moore's unhappiness was not relevant: "Sometimes I get to this stage and someone says well, now we've patched everything up and I want to continue on with him. But that sounds like it's not the case here; is that right? . . . . Okay. So . . . . you're not asking for a different lawyer, you've already gotten one different lawyer. . . . You're seeking to just represent yourself; is that right?" *Id.*

Moore responded affirmatively, and the court conducted a colloquy during which Moore confirmed the following: (1) he must follow the rules, (2) the charge

is serious, (3) the maximum penalty includes 10-years imprisonment, (4) he'll face logistical hurdles while incarcerated, (5) he'll be outmatched by the Government's skilled attorneys, (6) his decision is "entirely voluntary" in that nobody "twisted [his] arm or suggested that [he] should do this," (7) Moore has "the right to have Mr. Johnson continue on," and (8) the court's "strong suggestion" is to proceed with counsel. ECF 138, p. 3-9.

But the court did not ask Moore *why* he was dissatisfied with counsel. Nor did the court determine whether Moore's complaints generated concerns about counsel's efficacy. Nor did the court explain to Moore his right to counsel includes the right to *competent* counsel. The court granted the motion to withdraw and appointed Johnson as standby counsel. *Id.* at p. 9, 13-14.

### 4. The district court denied Moore's motion to subpoena defense witnesses.

Before trial, Moore filed an authorized *ex parte* motion, pursuant to Federal Rule of Criminal Procedure 17(b), to subpoena three witnesses for his defense at court expense. ECF 85. The district court summarily denied the motion – although Moore's motion identified the witnesses, the motion failed to explain their necessity to Moore's defense. ECF 86.

Moore thereafter filed an amended Rule 17(b) motion. ECF 87. The amended filing listed the same three witnesses and averred their testimony was "necessary to an adequate defense" because they "had access and ability to enter the structures in which the firearms were found," and they were familiar with how Moore stored his firearms. *Id.* at 2. The district court again summarily denied Moore's request. ECF 94. This time, the court said it was "unclear" how these facts related to any defense. *Id.* at 2. Ultimately, David Moore testified at trial. But Joshua Moore and Rita Sue Martin did not. *See* ECF 140, p. 6-7.

## 5. The Jury Trial

The parties agreed that while searching Moore's residence, authorities found numerous firearms inside his home and shed. ECF 137, p. 192-93. In the Government's view, all three were short-barrel rifles because they consisted of an upper receiver under 16" long, and a lower receiver with a "shoulder stock." *Id.* at p. 195-96. Moore did not contest that the weapons were short-barrel rifles during trial. Instead, he lodged a reasonable-doubt defense, contending his residence was jointly occupied, and numerous individuals therefore had access to the firearm parts. ECF 137, p. 203-07. Thus, although the upper and lower parts were *purchased* by Moore, Moore alleged the Government could not prove that the

11

allegedly unlawful weapons were *assembled* or *configured* by Moore, as opposed to another residential occupant, or that Moore knew the weapons had been so configured. *Id.*

Agent Regucci was the team leader for the search warrant execution. ECF 137, p. 116. Inside the residence, firearms were hanging from the ceiling and were immediately visible upon walking inside. *Id.* at p. 125. Three were pertinent to the prosecution. The first was a loaded PSA rifle model PA15, 300-caliber. *Id.* at p. 125-28. The second was a loaded BCA rifle multi-caliber, which was hanging from the ceiling. *Id.* at p. 129-31. The third, a PSA rifle, Model PA15, was hanging in a bedroom. *Id.* at p. 131-33. ATF paperwork showed some of the individual frame parts were purchased by, and registered to, Moore. *E.g.*, *id.* at p. 143-45, 148, 153. The lowers had barrels which were shorter than 16 inches long. *Id.* at p. 155, 158. These firearms were recovered in "fire" mode with the safety off. *Id.* at p. 125-28. Overall, police seized about 35 weapons from the residence. *Id.* at p. 138-39. Asked whether the firearms were lawful versus unlawful, Regucci admitted she wasn't sure – "I'm not a firearms expert." *Id.*

ATF Special Agent Bodnar testified the AR platform is separated by an upper assembly and a lower receiver. ECF 137, p. 141. The lower receiver is the

"frame," contains a serial number, houses the magazine and trigger, and is classified as a "firearm." *Id.* The upper assembly contains the "bulk carrier group" including the firing pin. *Id.* They're purchased separately and can generally be used interchangeably. *E.g.*, ECF 137, p. 141-42.

Bodnar explained why Moore's firearms were "rifles." They contain an "extendable butt stock." ECF 137, p. 142-43. There are several ways to identify a "butt stock" – (1) it features padding and surface area for shoulder firing, and (2) it has a rifle bore. *Id.*; *see also id.* at p. 169-70. By contrast, some pistols have a "pistol brace" to secure a weapon to the forearm. *Id.* at p. 167. But despite being labeled as a "pistol brace," pistol rearward extensions allow the user to fire from the shoulder too. *Id.* at p. 170-71.

On cross by Moore, Agent Bodnar admitted the firearms could be easily disassembled into their uppers and lowers and then reassembled into *lawful* firearms – the pistol-length upper could be lawfully placed on a pistol-style lower; the lower, which the Government alleged was a rifle, could be lawfully attached to a rifle-length upper. ECF 137, p. 160-61, 166. To assemble/disassemble the parts, all that is required is "push[ing] two pushpins." *Id.* at p. 168.

Bodnar further admitted, on cross, that authorities chose not to conduct DNA/fingerprint analysis of the firearms, *id.* at p. 162, so someone else might have assembled the firearms unlawfully *after* Moore purchased the lawful components, thereby violating the statutes without Moore's permission or knowledge. There was some support for this defense theory: First, Bodnar admitted Moore's residence contained lawful rifle-length uppers, which, if attached to the registered lowers, would be lawful to possess even without paying the tax. *Id.* at p. 163, 165-66. Second, Moore bought the uppers and lowers separately, further undermining the idea that he planned to assemble them into a single weapon. *Id.* at p. 165. The Government rested. *Id.* at p. 171.

The defense presented testimony from Moore's nephew, David Moore. ECF 137, p. 176-78. David testified he'd been to Moore's home to "sho[o]t guns around each other a bunch." *Id.* Moore had no history of leaving his guns on "fire." *Id.* Sometimes, Moore's relatives shot guns at Moore's home while Moore was not present. *Id.* On cross, David agreed Moore was "a gun guy." *Id.* at p. 178. The defense rested. *Id.*

During summations, the prosecution contended this was a simple case: Moore purchased the parts, assembled them into short-barrel rifles, and chose not

to register them. ECF 137, p. 193. Addressing the defense, the prosecutor agreed that it was possible someone else assembled these parts into the unlawful short-barrel rifles, "but you'd have to speculate to get there." *Id.* at p. 198.

During the defense's close, Moore contended the jury wouldn't need to speculate if the police had simply tested the firearms for DNA and fingerprints. ECF 137, p. 203-04. Moore contended there was insufficient proof he assembled the firearms himself, emphasizing testimony that (1) Moore himself always activated the "safety" yet these guns were set to "fire," (2) assembling the guns is easy and requires only two pushpins, and (3) many people had access to the guns outside Moore's presence. *Id.* at p. 205-07.

During its rebuttal argument, the prosecutor urged the jury to reject Moore's reasonable-doubt defense, contending it was not credible because the guns were highly visible to residents like Moore, and because it was unlikely another person made the same accidental error three times. ECF 137, p. 209-11.

### 6. Motion for New Trial

The jury returned a verdict of guilty as charged on September 30, 2024. ECF 101. The district court adjudicated Moore guilty and set a sentencing hearing. ECF

137, p. 222. At Moore's request, attorney Johnson was reappointed on his behalf. *Id.* at p. 222-23.

Through counsel, Moore filed a timely motion for new trial October 8, 2024. ECF 105. The motion alleged that during *voir dire*, a seated juror falsely claimed he did not know Moore, Moore's mother, and Moore's nephew. In truth, the juror has had several interactions with Moore and his relatives, including "a disagreement with the juror" occurring at a mutual hunting club. *Id.* at p. 2. The motion sought a new trial, contending the juror "failed to honestly answer a question during *voir dire*,"[4] and that "a correct response would have provided a valid basis for a challenge for cause." *Id.* at p. 3.

The Government filed a response, agreeing the motion was timely but contending Moore cannot establish the juror deliberately lied or was actually biased. ECF 106.

The district court denied the motion on October 17, 2024, finding (1) Moore should have discovered the issue before verdict, so the information was not "newly discovered," (2) the juror's incorrect response might have been an inadvertent

---

[4] During *voir dire*, the district court introduced the parties and confirmed none of the jurors knew Moore or anything about the case. ECF 136, p. 39-41. These responses were made under oath. *Id.* at p. 20.

misstatement, (3) there was no proof of actual bias, and (4) Moore's motion did not identify the juror. ECF 107.

On November 4, 2024, Moore filed a pro-se document entitled "motion for reconsideration of motion for new trial." ECF 110. This filing corrected several omissions in the initial motion: It identified the seated juror by name (*id.* at p. 1), elaborated about the juror's false answer and actual bias against Moore and his family, and explained why Moore did not discover the issue until after verdict.

The juror had known Moore's family for over ten years and had multiple reasons to dislike Moore. ECF 110, p. 1. At a mutual hunting club frequented by Moore and his testifying nephew, Moore and the juror had an altercation after the juror shot at Moore's wife. *Id.* Moreover, the juror dislikes Moore's mother because the mother is close friends with the juror's mother-in-law, with whom the juror does not get along. *Id.* at p. 2.

Regarding Moore's awareness of the juror, Moore explained he is nearsighted and unable to see or identify someone past several feet, a fact his standby counsel could corroborate. ECF 110, p. 2. Moore even included an embarrassing anecdote – Moore's vision is so poor that during trial, he waved and blew a kiss at a stranger, thinking it was his wife. *Id.*

The Government filed a response, arguing Moore's family should have alerted the defense team, or Moore should have requested glasses. ECF 115, p. 2. Moore filed a pro-se response, explaining he was not allowed to communicate with his wife during the one-day trial, and that his other relatives were not permitted inside the courtroom during trial; he spoke with his wife when he returned to custody after trial, and that is when he learned about the juror's presence. ECF 117, p. 1.

The court held a hearing on December 3, 2024. ECF 139. Moore indicated he wanted to represent himself because attorney Johnson's motion for new trial omitted the juror's name, the intense and memorable nature of Moore's feud with the juror, and facts which explained why Moore learned about the juror after the verdict. *Id.* at p. 2-3. The court indicated Moore's explanation was surprisingly long and that Moore really didn't need to tell the court about the dispute. *Id.* The court confirmed it was "100% [his] desire" to represent himself, "the motion that [Johnson] put in for me, he just didn't put the [juror's] name in and different things that I wanted added . . . that . . . there was no doubt that he knew me."

The district court filed an order December 27, 2024. ECF 119. The order said Moore's filings were unauthorized. *Id.* at p. 1-2. The order also denied relief on

the merits, finding (1) Moore's wife should have seen the juror and alerted standby

counsel before the verdict, or (2) Moore should have recognized the juror's name

when he heard it, or (3) Moore should have addressed his glasses issue with the

court. *Id.* at p. 2. The court repeated its prior *Faretta* colloquy, emphasized

appointed counsel's experience, and granted Moore's request, placing Johnson on

standby. *Id.* at p. 3-7.

### 7. Sentencing

The guidelines range was 51-63 months' imprisonment, with an offense level

of 22 and a criminal history category 3. ECF 118, p. 6, 8, 17; ECF 126. Moore

sought a sentence which was concurrent to his existing 21-year BOP sentence,

citing mitigation including his father's recent death and Moore's advanced age of

47. ECF 140, p. 7, 12-13. He also presented letters of support from his wife and

children. ECF 140, p. 3.

The Government argued Moore's criminal history was short but serious, and

requested a consecutive guidelines sentence to promote deterrence and community

safety. ECF 140, p. 8-9.

The district court pronounced the sentence: 36-months' imprisonment plus

three-years' supervised release, with the imprisonment ordered consecutive to the

sentence from Florida's Middle District. ECF 140, p. 14-15; ECF 125. Moore filed a timely notice of appeal. ECF 123.

(iii)        Standards of Review

**Issue one**: In reviewing the denial of a motion for new trial based on alleged juror dishonesty during *voir dire*, the "standard for reversing a trial court's determination of jury bias is 'manifest abuse of discretion.'" *United States v. Perkins*, 748 F.2d 1519, 1533 (11th Cir. 1984) (citations omitted).

**Issue two**: This Court reviews the denial of a Rule 17(b) motion for abuse of discretion. *United States v. Muho*, 978 F.3d 1212, 1219 (11th Cir. 2020) (citing *United States v. Rinchack*, 820 F.2d 1557, 1566 (11th Cir. 1987)).

**Issue three**: The district court's finding that a defendant's waiver of the right to counsel is knowing, voluntary, and intelligent is a mixed question of law and fact to be reviewed *de novo*. *United States v. Kimball*, 291 F.3d 726 (11th Cir. 2002).

**Issue four**: The grant or denial of a motion to suppress evidence is a mixed question of fact and law; factual findings are reviewed for clear error, and application of the law to the facts is reviewed de novo. *United States v. Matchett*, 802 F.3d 1185, 1191 (11th Cir. 2015) (citation omitted). This Court "review[s] a

district court's denial of a *Franks* hearing for an abuse of discretion." *United States v. Goldstein*, 989 F.3d 1178, 1197 (11th Cir. 2021) (citation omitted).

**Issue five**: "When a defendant challenges the constitutionality of a statute, . . . the review is *de novo*." *United States v. Bolatete*, 977 F.3d 1022, 1032 (11th Cir. 2020) (citation and internal quotation marks omitted).

**Issue one**: A new trial should be granted where, as here, (i) a juror failed to honestly answer a material question during *voir dire*, and (ii) a correct response would have provided a valid basis for a cause challenge. This standard is met here, where a seated juror had previously shot at Moore's wife yet responded, under oath, he did not know Moore or his family. This information was newly discovered to Moore, whose vision is poor, and who reasonably relied on the juror's sworn responses during *voir dire*. The conviction should be reversed. Alternatively, the case should be remanded for an evidentiary hearing where Moore can substantiate his facially sufficient claims.

**Issue two**: The district court abused its discretion in denying Moore's Rule 17(b) request for witness subpoenas. Moore sufficiently alleged their testimony was relevant and necessary to the defense, because it raised doubts about whether the firearms were constructively possessed by Moore. The error violated Rule 17(b) and Moore's constitutional right to present a defense. The case should be reversed and remanded for a new trial.

**Issue three**: The district court failed to ensure Moore's waiver of counsel was voluntary. Moore alleged dissatisfaction with appointed counsel before both

trial and sentencing. On both occasions, the *Faretta* inquiries were thoughtful but inadequate. The court did not ask Moore *why* he was dissatisfied with counsel, determine whether Moore's complaints generated concerns about counsel's efficacy, or explain the right to counsel includes a right to *competent* counsel. The court therefore failed to ensure Moore was not forced to decide between inadequate counsel and self-representation, a dilemma of constitutional magnitude. The issue requires reversal of the sentence (Issue three-B) and conviction (Issue three-C).

**Issue four**: The Court should reverse the denial of Moore's suppression motion. The police implicated the Fourth Amendment long before they secured a search warrant. And as Moore's motion alleged, the search-warrant affidavit included (i) information learned during Fourth Amendment violations, and (ii) omissions and misstatements about the pre-warrant information learned from witnesses. These allegations were neither estopped nor time-barred, considering Moore's pro se status and his physical limitations. The court should have granted suppression or, at a minimum, held a hearing under *Franks* and *Murray*. The case should be reversed and remanded with instructions to grant suppression or, alternatively, to hold an evidentiary hearing.

**Issue five**: The Court should vacate the conviction because the National Firearm's Act (NFA) violates the Second Amendment. The Second Amendment's "plain text" protects Moore's conduct of possessing a short-barrel rifle inside his home. The Government cannot meet its burden of showing the NFA is consistent with the Nation's tradition of firearm regulation. Moore recognizes *United States v. Miller*, 307 U.S. 174 (1939), but he contends the case is abrogated and distinguishable. This case should be remanded with instructions to grant Moore's motion to dismiss.

# ARGUMENTS

## Issue one

### The district court reversibly erred in denying the motion for new trial.

The Sixth Amendment grants criminal defendants the right to a jury of his or her peers. U.S. Const. Amend. VI. The jury must be "capable and willing to decide the case solely on the evidence before it . . . ." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). *Voir dire* protects this right "by exposing possible biases, both known and unknown, on the part of potential jurors." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984).

"A defendant must be given a new trial where he or she 'demonstrate[s] that a juror failed to answer honestly a material question on *voir dire* and then further show[s] that a correct response would have provided a valid basis for cause.'" *United States v. Bolinger*, 837 F.2d 436, 438 (11th Cir. 1988) (quoting *United States v. Perkins*, 748 F.2d 1519, 1531 (11th Cir. 1984)).

Here, this standard is met. Regarding the first *Bolinger* requirement, Moore filed a timely[5] motion alleging the juror failed to honestly answer a material question about whether the juror knew Moore and Moore's witnesses. ECF 136, p. 20, 39-41; ECF 110; ECF 117, p. 1; ECF 105. This omission was not an honest mistake according to Moore, who alleged the juror's knowledge of Moore and his family was extensive. The juror knew Moore for over ten years, disliked Moore's mother, knew Moore's defense witness, and got into a fight with Moore after the juror shot at Moore's wife.

These matters were material because they relate to animosity between the juror and Moore, a fertile ground for cause challenges. *See Perkins*, 748 F.2d at 1532-33 (citing *United States v. Nell*, 526 F.2d 1223 (5th Cir. 1976); *United States v. Bailey*, 468 F.2d 652, 658 (5th Cir. 1972)). Consequently, the trial court clearly erred in deciding – without holding an evidentiary hearing – that Moore failed to establish the juror's response was dishonest, incorrect, and material.

---

[5] After 14 days from the date of the verdict, a motion for new trial is only timely if it is based on newly discovered evidence. Fed. R. Crim. Pro. 33. "[A] motion for new trial based on juror misconduct is a form of new trial motion for newly discovered evidence." *United States v. Bolinger*, 837 F.2d 43, 439 (11th Cir. 1988) (citing *United States v. Jones*, 597 F.2d 485, 488 (5th Cir. 1979)). Thus, Moore's initial motion (ECF 101) and his pro se supplemental filing (ECF 110) each meet the temporal limitations of Rule 33.

Regarding the second *Bolinger* requirement, Moore sufficiently alleged that if the juror answered honestly, the correct response would have provided a valid basis for cause. "A party who seeks a new trial because of non-disclosure by a juror during *voir dire* must show actual bias." *Perkins*, 748 F.2d at 1532 (citing *United States v. Tutt*, 704 F.2d 1567, 1569 (11th Cir.)). "[I]n most cases, *the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial*." *Id.* (emphasis in original) (quoting *McDonough*, 464 U.S. at 556-57 (Blackmun, J., concurring)). Thus here, the juror's "dishonesty, in and of itself, is a strong indication that he was not impartial." *Id.*

Moreover, the specific information the juror concealed creates an additional inference of bias. "A relationship between a juror and defendant, albeit a remote one, can form the basis of a challenge for cause." *Perkins*, 748 F.2d at 1532-33 (citing *Nell*, 526 F.2d at 1223; *Bailey*, 468 F.2d at 658). Here, the relationship was anything but remote. The juror got into a fight with Moore after the juror shot at Moore's wife. The juror also disliked Moore and his mother, and he knew a defense witness who testified on Moore's behalf.

Given the inferences of actual bias that arise from the fact that the juror felt compelled to misrepresent his history with Moore and Moore's family and

witnesses, actual bias should be presumed. "Doubts about the existence of actual bias should be resolved against permitting the juror to serve, unless a prospective panelist's protestations of a purge of preconception [are] positive, not pallid." *Perkins*, 748 F.2d at 1533 (quoting *Nell*, 526 F.2d at 1230).

In denying Moore's motion, the district court reasoned the juror's identity was known to Moore and his wife throughout the trial. ECF 107, 119. But Moore and his wife were not permitted to communicate during the one-day jury trial. ECF 117, p. 1. Moreover, Moore should not have been held accountable for information known to a nonparty. And Moore indicated he was unable to see the juror's face due to poor vision. ECF 110, p. 2. Thus, for diligence purposes, Moore reasonably relied on the juror's sworn affirmation the juror did not know Moore. Because that response turned out to be untrue, and because the truthful response would have generated a cause challenge, the district court should have ordered a new trial.

In sum, the juror's prior act of shooting at Moore's wife, and his animosity towards Moore and his family, generate presumptive actual bias – particularly when considered alongside the juror's conduct in secreting these facts. This juror should have been excused for cause to ensure Moore's right to a fair trial was preserved. The district court abused its discretion in denying Moore's motion for a

new trial without a hearing. The case should be reversed and remanded with instructions to grant the motion for new trial. Alternatively, at a minimum, the case should be remanded for an evidentiary hearing regarding Moore's allegation that a seated juror failed to honestly answer a material question, and that the honest answer would have provided a valid basis for a cause challenge.

**Issue two**

**The court erred in denying Moore's motion to subpoena witnesses (ECF 87). The denial violated Rule 17 and Moore's constitutional rights to due process, to compel witnesses, and to present a defense.**

Rule 17(b) allows a defendant unable to pay for witnesses to make an *ex parte* application demonstrating their inability to pay and the necessity of the witness's presence for an adequate defense. Fed. R. Crim. Pro. 17(b). A subpoena should be granted where "the defendant is financially unable to pay the fees of the witness and that the presence of the witness is necessary for an adequate defense." *Rinchack*, 820 F.2d at 1566 (citing Fed. R. Crim. Pro. 17(b)).

This standard is met here. Moore, who is indigent, sought to subpoena three witnesses: David Moore, Joshua Moore, and Rita Sue Martin. ECF 87. His motion averred their testimony was "necessary to an adequate defense" because they "had access and ability to enter the structures in which the firearms were found," and they were familiar with how Moore stored his firearms. *Id.* at 2.

The testimony of individuals who had access to Moore's residence and were aware of his firearm storage methods was relevant to rebutting the prosecution's claim of constructive possession of the unregistered short-barrel rifles.

30

Constructive possession required proof Moore knew of the weapon and intended to control it. ECF 98, p. 5. Testimony about access and storage habits could help the defense argue that others had control or knowledge of the unregistered rifle, not Moore. This could potentially create reasonable doubt about Moore's constructive possession. The testimony was therefore crucial defense evidence which could establish an alternative explanation for the rifle's presence, fulfilling Rule 17(b)'s requirements. The district court therefore erred, and violated Rule 17(b), in denying Moore's request for a subpoena.

And although David Moore ultimately testified, the district court's ruling also violated Moore's rights to due process, to compel witnesses, and to present a defense. The exclusion of exculpatory evidence is harmful if it deprives the defense of critical corroboration on an important, disputed issue. *See Washington v. Texas*, 388 U.S. 14 (1967) (under Sixth Amendment, defendant entitled to corroborate his testimony with consistent eyewitness testimony).

In *Washington*, the defendant testified he tried to flee before the fatal shooting at issue. 388 U.S. at 16. The Supreme Court held, under the Sixth Amendment, Washington had a right to present testimony from an eyewitness (Mr. Fuller) that corroborated Washington's testimony. *Id.* at 23. And because the court

had excluded Fuller's testimony during trial, the conviction was reversed despite the admission of similar testimony through another witness, Washington: "Fuller was the only person other than petitioner who knew exactly who had fired the shotgun and whether petitioner had at the last minute attempted to prevent the shooting." *Id.* at 16; *see also Holmes v. South Carolina*, 547 U.S. 319 (2006) (regardless of strength of the government's case, defendant is constitutionally entitled to present evidence which points to an alternative suspect).

Here, as outlined below, Moore was similarly deprived of critical corroborative evidence, evidence which created doubts about Moore's guilt and suggested someone else assembled/possessed the firearms at issue. Therefore, in denying Moore's requested subpoenas, the district court violated Moore's constitutional right to present a defense. *See United States v. Edwards*, 469 F.2d 1362, 1369 (5th Cir. 1972) (indicating Rule 17(b) implicates and protects the Sixth Amendment right to compulsory process and present evidence).

David Moore's testimony mattered. He testified Moore never left his weapons on the "fire" setting and that others had access to Moore's weapons. ECF 137, p. 176-78). This testimony supported Moore's defense that he did not build or possess the assembled short-barrel rifle: As the Government's witnesses

explained, the firearms at issue were all set to "fire." *Id.* at 125-28. Consequently, if David were believed, then reasonable doubts existed about Moore's guilt.

Corroboration was important because David's credibility was contested by the prosecutor. Whereas David testified Moore *never* stored firearms without the safety, the prosecutor argued: "Except he did. . . . He's defending his home is what he's doing." ECF 137, p. 210. And whereas David testified Moore's firearms were accessible to extended family, the prosecutor argued this aspect of David's testimony was *also* false: "They were located in places that were limited to the person who lives in the house such as the living room, such as a bedroom. . . . He . . . . stored them . . . in places that only the person who is living there is going to be. That is the evidence you've seen. Speculating or forcing or imagining some doubt beyond that goes beyond the government's burden in this case." *Id.* at 198-99. As these passages show, the prosecutor urged the jury to reject David's testimony. Thus, corroboration of that testimony was critical to the defense.

And per Moore, Rita and Joshua would have corroborated David: All would testify they had access to Moore's firearms and knowledge of his storage habits. ECF 87, p. 2. More therefore had a constitutional right to present evidence which corroborated David's testimony. That right was violated when the district court

denied Moore's requested subpoenas. The conviction and sentence should be reversed.

## Issue three

### The district court reversibly erred in allowing Moore to represent himself without ensuring his Sixth Amendment waiver of counsel was voluntary.

Moore represented himself during the jury trial and sentencing hearings. Before allowing self-representation, the district court conducted numerous Sixth Amendment colloquies. These colloquies were thoughtful but deficient, and they produced involuntary waivers of the right to counsel, because they did not ensure Moore knew of his right to competent counsel. As a result, the Court should reverse Moore's conviction (Issue three, part C) and his sentence (Issue three, part B).

### A. To voluntarily waive the Sixth Amendment right to counsel, the defendant must be aware of his right to *competent* counsel.

A criminal defendant has the right to appear *pro se* if he voluntarily, knowingly, and intelligently waives his Sixth Amendment right to counsel. *Faretta v. California*, 422 U.S. 806, 835 (1975). The ideal method of assuring the validity of the waiver is to hold a *Faretta* hearing wherein the defendant would be informed of the charges, basic trial procedures, and the hazards of self-representation. *Strozier v. Newsome*, 926 F.2d 1100, 1104 (11th Cir. 1991) (citing *Sanchez v. Mondragon*, 858

F.2d 1462, 1467 (10th Cir. 1988)); *see also United States v. Cash*, 47 F.3d 1083, 1088 (11th Cir. 1995) (citing *Sanchez*, 858 F.2d at 1467).

Often, courts apply an eight-factor test to decide whether the waiver was knowing, voluntary, and intelligent. *United States v. Stanley*, 739 F.3d 633, 645-46 (11th Cir. 1991). But when an indigent defendant seeks to discharge counsel based on alleged omissions in the attorney's performance, special rules apply.

In analyzing a waiver's voluntariness, "[t]he central question is whether the defendant knew of his right to *competent* counsel." *Sanchez*, 858 F.2d at 1465 (emphasis in original). "[A] choice between proceeding with incompetent counsel or no counsel is in essence no choice at all." *Pazden v. Maurer*, 424 F.3d 303, 313 (3d Cir. 2005) (quoting *Wilks v. Israel*, 627 F.2d 32, 35 (7th Cir. 1980)).

Consequently, when an indigent defendant indicates he wants to represent himself due to dissatisfaction with appointed counsel, the district court has an important obligation: It must ensure "the defendant is not forced to make a choice between incompetent counsel or appearing pro se." *Pazden*, 424 F.3d at 313 (quoting *United States v. Taylor*, 113 F.3d 1136, 1140 (10th Cir. 1997)); *accord United States v. Silkwood*, 893 F.2d 245, 248-49 (10th Cir. 1989); *Sanchez*, 858 F.2d at 1467; *Maynard v. Meachum*, 545 F.2d 273, 278 (1st Cir. 1976).

In *Silkwood*, for example, the defendant informed the court he wanted to proceed *pro se* because he believed trial counsel spent insufficient time preparing his case and that he could represent himself more effectively. 893 F.2d at 248-49. Rather than thoroughly inquiring into the defendant's allegations of incompetence, the trial court "merely attempted to persuade him that trial counsel had done an excellent job in light of the circumstances." *Id.* In reversing the sentence, the Tenth Circuit held the ensuing Sixth Amendment waiver was involuntary because the district court "failed to ensure that [the defendant] was not forced to make the Hobson's choice against which *Sanchez* warns, a choice between incompetent or unprepared counsel and appearing *pro se.*" *Id.*

Along similar lines, the First Circuit remanded a *pro se* case due to an involuntary waiver in *Maynard v. Meachum*, 545 F.2d 273, 278 (1st Cir. 1976). In *Maynard*, the defendant attempted to fire court-appointed counsel and obtain new court-appointed counsel, alleging his present attorney wasn't skilled enough to manage the case. *Id.* at 276. The trial court denied the request, allowed the defendant to proceed pro se, and ordered counsel to serve as standby. *Id.* On habeas review, the First Circuit held the interaction raised the issue of effective waiver of counsel. The court therefore remanded the case for further factfinding,

explaining that when a defendant proceeds *pro se* because he objects to court-appointed counsel, "whether [the defendant's] decision was voluntary will turn on whether his objections to his appointed counsel were such that he had a right to a new appointed counsel." *Id.* at 278.

The Third Circuit applies the same standards as the First and Tenth Circuits: "[A] choice between incompetent or unprepared counsel and appearing *pro se* is a dilemma of constitutional magnitude. The choice to proceed *pro se* cannot be voluntary in the constitutional sense when such a dilemma exists." *Pazden*, 424 F.3d at 319 (quoting *Sanchez*, 858 F.2d at 1465). In *Pazden*, habeas relief was warranted where the defendant represented himself because court-appointed counsel would not be ready by the trial date. *Id.* at 314-15. Against that backdrop, the case was reversed *even though* the district court conducted a thoughtful colloquy with the defendant: In conducting the *Faretta* inquiry, the district court "failed to realize [the] constitutional significance" of the defendant's responses, which involved dissatisfaction with trial counsel. *Id.* at 319.

These cases reflect a consensus among the circuits. When a defendant seeks self-representation based on dissatisfaction with appointed counsel, a waiver of counsel is involuntary unless the district court ensures the defendant knows about

his right to competent counsel and ensures the defendant isn't placed in a dilemma of constitutional magnitude.

## B. Moore's waiver of sentencing counsel was not voluntary.

Moore indicated he wanted to represent himself at sentencing because he was dissatisfied with the performance of court-appointed counsel. ECF 139, p. 2-3. Citing counsel's motion for new trial, Moore alleged it should have included the juror's name, the intense and memorable nature of Moore's altercation with the juror, and Moore's physical limitations which prevented him from discovering the juror's identity sooner. ECF 139, p. 2-3. Thus, "whether [Moore's] decision was voluntary will turn on whether his objections to his appointed counsel were such that he had a right to a new appointed counsel." *See Maynard*, 545 F.2d at 278.

But the court did not inquire into Moore's accusations. Instead, the court indicated the reasons weren't relevant: "Okay. That was a long answer, and I appreciate some of the explanation. You don't have to tell me why you want anything, but I just want to hear, is it 100% your desire right now, unequivocally, that you want to be your own lawyer for the rest of the case?" ECF 139, p. 2-3. This was error. Like *Pazden*, the case should be reversed because the district court's *Faretta* inquiry, while thoughtful, "failed to realize [the] constitutional

significance" of Moore's responses, which involved dissatisfaction with trial counsel.

And although the district court thereafter conducted a lengthy *Faretta* inquiry, that colloquy was deficient because it did not resolve Moore's accusations of deficient attorney performance. Instead, like the court in *Silkwood*, the district court endorsed the trial attorney's performance without inquiring into possible alleged deficiencies. *E.g.*, ECF 139, p. 7. As a result, Moore's Sixth Amendment waiver was not voluntarily made. The sentence should therefore be reversed, and the case should be remanded for a new sentencing hearing. *See Penson v. Ohio*, 488 U.S. 75, 88 (1988) (collecting cases holding the right to counsel is so basic to a fair trial that its denial can never be considered harmless error).

## C. Moore's waiver of trial counsel was not voluntary.

Along similar lines, Moore's waiver of trial counsel, occurring during the August 13, 2024, hearing, was also insufficiently voluntary. Moore explained he wanted to represent himself because he had a conflict or disagreement with counsel which "hasn't been resolved." ECF 138, p. 2. Although Moore's request was unequivocal, it also stemmed from dissatisfaction with trial counsel. Thus, for purposes of voluntariness, "[t]he central question is whether the defendant knew

of his right to *competent* counsel." *Sanchez*, 858 F.2d at 1465. This awareness cannot be presumed on the present record. The district court did not explicitly tell Moore he had a right to competent counsel, nor did the district court inquire about why Moore was dissatisfied with his present counsel. The conviction and sentence should therefore be reversed. *See Penson*, 488 U.S. at 88.

## Issue four

## The district court erred in denying Moore's motion to suppress without an evidentiary hearing.

### A. During the initial investigation, police conducted a warrantless search and seizure in violation of the Fourth Amendment.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Warrantless searches and seizures inside the home are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573 (1980). Evidence derived from unreasonable searches and seizures must be suppressed. *Wong Sun v. United States*, 371 U.S. 471 (1963).

The initial encounter between police and the Moores constituted a seizure. An investigatory stop occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *United States v. Knights*, 989 F.3d 1281, 1286 (11th Cir. 2021); *see Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). "The test for whether the officer restrained a citizen's liberty is whether 'a reasonable person would feel free to terminate the encounter.'" *Knights*, 989 F.3d at 1286 (quoting *United States v. Drayton*, 536 U.S. 194, 201 (2002)). In the vehicle context, a seizure occurs when detectives "park[] in front of and behind" a

citizen's car, "effectively box[ing] them in and block[ing] them from" driving away and terminating the encounter. *United States v. Gibbs*, 917 F.3d 1289, 1295-96 (11th Cir. 2019).

Here, Moore alleged that Deputy Elliott positioned his lights-activated patrol vehicle to prevent the Moores from driving away. ECF 81, p. 3-4; ECF 72, p. 1-2. This warranted an evidentiary hearing because, if true, these allegations constitute a seizure implicating the Fourth Amendment – by parking "catty corner," ECF 19, p. 3, Deputy Elliott blocked Moore from exiting in any direction – the car's front was already blocked off by chain-link lock. *See Gibbs*, 917 F.3d at 1295-96. The seizure occurred on Moore's private property and without probable cause, reasonable suspicion, or a warrant, ECF 72, p. 1-2; it therefore violated the Fourth Amendment.

The seizure also exceeded the officer's authority because it occurred outside his jurisdiction. Moore deserved a hearing on this claim, as at common law, an officer's authority to seize a citizen outside the officer's jurisdiction was limited: "At common law the territorial jurisdiction of the sheriff was limited to the county." Charles M. Kneier, *Territorial Jurisdiction of Local Law Enforcement*

*Officers*, 9 N.C. L. Rev. 283, 283 (1931) (citations omitted).[6] The Government did not prove the existence of a common-law exception to this limitation, such as fresh pursuit of a felon. The court therefore erred in concluding, without the hearing Moore requested, the initial encounter fell outside the scope of the Fourth Amendment.

And to the extent suspicion existed, it was stale by the time Elliott first encountered the Moores. As Moore alleged, forty minutes elapsed between the BOLO and the seizure. ECF 81, p. 3, 12. *See*, *e.g.*, *United States v. Gonzalez*, 190 F.3d 668, 672 (5th Cir. 1999) (whether a particular BOLO/tip justifies a stop depends on a variety of factors, including whether the report has gone stale).

The officers' second entry onto Moore's property also implicated the Fourth Amendment, constituting an unlawful trespass. Police trespassed upon Moore's private property without a warrant or an exception. ECF 19, p. 3-4. Moore acknowledges *Oliver v. United States*, 466 U.S. 170 (1984). But he respectfully contends that recent Supreme Court caselaw suggests police cannot, consistent with Moore's property-based rights, trespass on a person's real property to obtain

---

[6] Professor Kneier's 1931 article is available online: https://scholarship.law.unc.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1274&context=nclr (last visited June 4, 2025).

information without a warrant. *See Florida v. Jardines*, 569 U.S. 1, 6-7 (2013);

*United States v. Jones*, 565 U.S. 400, 406-08 (2012); *see also Carpenter v. United*

*States*, 138 S. Ct. 2206, 2267-68 (2018) (Gorsuch, J., dissenting). In short, the

police implicated the Fourth Amendment long before they obtained a search

warrant, and the warrantless investigation's fruits should have been suppressed.

**B. The court should have granted suppression, or, at the very least, held an evidentiary hearing.**

The search warrant did not purge the taint for two independent reasons: (1)

the warrant affidavit lacks PC after removing the unlawfully discovered information

and the false claims and omissions, and (2) the initial, unlawful conduct by police

"prompted" their decision to seek a warrant.

**1. Under *Franks* and *Murray*, the district court erred in deciding that, excluding any information gained by Elliott's seizure of Moore and trespassory search of his real property and trailer, there was still PC to support a search warrant for the Moore house.**

As Moore alleged, the search-warrant affidavit contained false and omitted

details about the preceding warrantless searches and seizures. His motions made a

substantial preliminary showing that false and omitted statements were necessary

to establish probable cause.

45

An evidentiary hearing is required when a defendant makes "a substantial preliminary showing" that statements or omissions made in an affidavit supporting a search warrant are deliberately false or made with reckless disregard for the truth. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009) (applying *Franks* to information omitted from a warrant affidavit). To obtain a *Franks* hearing, a defendant must not only show that the affiant made false statements or omissions "intentionally or with reckless disregard for the truth," but also that the false statements or omission were "necessary to the finding of probable cause." *Kapordelis*, 569 F.3d at 1309.

Broadly, Moore alleged that if facts were corrected and included, the witness descriptions would not *precisely* match his hair[7] or height,[8] and that witnesses identified the robber as another customer who *does* fit those descriptions.[9] The vehicle descriptions would not point to his vehicles other than vague and generic details like "white Ford truck" and "sedan"[10] – only the fourth robbery involved a license-plate BOLO, and the tag recited did not match anything owned by Moore.

---

[7] ECF 81-1, p. 6; ECF 89, p. 1.
[8] ECF 83, p. 2; ECF 81, p. 5-6; ECF 89, p. 1.
[9] ECF 81, p. 6; ECF 89, p. 1.
[10] *E.g.*, ECF 81, p. 3-5; ECF 81-1, p. 3-4; ECF 81, p. 6; ECF 81-4, p. 29.

(Although Moore possessed a tag with a similar number, that number is off by a digit and there was no evidence the police would have discovered and included this correction but for the stop.[11]) Indeed, the additional details about the cars were *inconsistent* with known cars of the Moores – Moore's wife rented a *gray* sedan around the time that a *black* sedan was observed at the second robbery. ECF 81, p. 6, 9; ECF 81-1, p. 13, 15. The gray sedan was equipped with GPS and, per Moore, was never near the scene. *Id.* Moore's wife drove that gray sedan the day of the illegal roadside stop, which Moore contended conflicted with witness descriptions of silver and ice blue. ECF 81, p. 3-4, 6; ECF 81-4, p. 29.

Thus, if Moore's allegations were true, they diminished the particularity and weight of the evidence against Moore. He did not *precisely* match the description of the robber; his cars did not meet the description of the getaway vehicles; and there was a compelling alternate suspect who *better* matched the witness descriptions. Probable cause was further diminished if we remove details gleaned from the first two encounters on Moore's property, encounters Moore contends violated the Fourth Amendment as outlined above. Overall, Moore's motions constituted a substantial showing that recklessly false or omitted facts were necessary to a finding

---

[11] ECF 83, p. 2; ECF 81, p. 6-7.

of probable cause. The court reversibly erred in denying Moore's request for an evidentiary hearing and in denying the motion to suppress.

## 2. The district court erred in applying *Murray*.

There is a second, independent basis for reversal. The issuance of a search warrant is *not* an independent source if the initial, unlawful search/seizure "prompted" the officer's "decision to seek the warrant" or "affected" the Magistrate's "decision to issue the warrant." *Murray v. United States*, 487 U.S. 533, 541 (1988).

Applying *Murray*, this Court undertakes a "two-part test" when police conduct an unlawful search or seizure and then rely on the fruits to obtain a search warrant. *United States v. Noriega*, 676 F.3d 1252, 1260 (11th Cir. 2012) (citing *United States v. Chaves*, 169 F.3d 687, 692-93 (11th Cir. 1999)). First, the Court "excise[s] from the search warrant affidavit any information gained during the arguably illegal initial entry and determine whether the remaining information is enough to support a probable cause finding." *Id.* (citing *Chaves*, 169 F.3d at 692-93).

If probable cause remains, the second question is "whether the agents' decision to seek the warrant was . . . 'prompted by' what they had seen during the

initial entry." *Id.* (citing *Murray*, 487 U.S. at 542; *Chaves*, 169 F.3d at 693). "That is a question of fact" which must be resolved by the district court. *Noriega*, 676 F.3d at 1263. Where, as here, the district court does not make the requisite factual findings, the case should be remanded with directions to determine whether police would have sought a search warrant if they had not conducted a prior unlawful search/seizure. *Id.* (remanding with such instructions); *United States v. Barron-Soto*, 820 F.3d 409, 415 (11th Cir. 2016) (describing same process in this appeal after remand); *United States v. Albury*, 782 F.3d 1285, 1290 (11th Cir. 2015) (same).

Here, Moore contends the police would have lacked probable cause without the information which was either false or obtained via illegal prior search/seizure as outlined above. Moreover, the record contains no express finding as to whether authorities would have sought the search warrant had they not previously conducted the roadside stop and the subsequent trepassory search. And in light of this Court's decisions in *Barron-Soto*, *Albury*, and *Noriega*, such a finding is necessary to determine whether the search of Moore's home fell within the purview of the independent-source doctrine. Consequently, if this Court concludes the affidavit supports probable cause without the allegedly unreasonable and false prior observations (a conclusion Moore disputes as outlined above), Moore

requests a limited remand so the district court may conduct the proceedings needed to make such a finding.

### C. Moore's motions were neither time-barred nor estopped.

Moore's filings contained numerous amendments and requests for reconsideration. But there was good cause for this timeline. *Cf. Fernandez v. United States*, 941 F.2d 1488, 1491 (11th Cir. 1991) (*pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys; courts should construe such filings liberally and "look behind the [motion's] label" to determine if a cognizable remedy is available) (citations omitted). Moore was required to hand-write all pleadings, despite his persistent requests for a laptop. He also did not timely receive discovery from former counsel. ECF 138, p. 5-6. The absence of a laptop dramatically slowed Moore's progress, because he has chronic injuries which are severe and impact his writing arm. The injuries stem from a 2016 car accident and a 2022 incident in which another inmate threw him down a staircase. ECF 118, p. 12; ECF 133, p. 20; ECF 134, p. 12. Thus, the Court should address the merits of Moore's filings, instead of affirming on timeliness grounds.

Regarding collateral estoppel, the doctrine does not apply to criminal defendants. *United States v. Harnage*, 976 F.2d 633, 636 (11th Cir. 1992) ("[W]e

hold that the government may not collaterally estop a criminal defendant from relitigating an issue decided against the defendant in a different court in a prior proceeding."); *see also United States v. Pelullo*, 14 F.3d 881, 891 (3d Cir. 1994) (defendant convicted by first jury of wire fraud retained right to relitigate guilt of that offense during RICO trial with second jury); *United States v. Gallardo-Mendez*, 150 F.3d 1240 (10th Cir. 1998) ("[W]hile 'wise public policy and judicial efficiency' may be sufficient reasons to apply collateral estoppel in civil cases, they do not have the same weight and value in criminal cases."). For these reasons, the suppression issue is neither time-barred nor collaterally estopped.

In sum, the police implicated the Fourth Amendment long before they obtained a warrant. All evidence derived from the unlawful warrantless search/seizure should have been suppressed. This includes the fruits of the subsequent search warrant, because (1) the illegal search/seizure prompted the decision to seek a search warrant, and (2) there was insufficient PC without the affidavit's false and omitted information. The case should be reversed and remanded with instructions to grant the motion to suppress. Alternatively, at the very least, the case should be remanded for factfinding about whether police would

have sought a warrant if they had not previously violated Moore's Fourth

Amendment rights.

**Issue five**

**The NFA violates the Second Amendment.**

Possessing a short-barrel rifle is presumptively protected by the Second Amendment. That presumption puts the burden on the government to show a historical tradition of requiring people to register short-barrel arms before possessing them. The government cannot meet that burden.

**A. Regulations that restrict presumptively-protected conduct must be consistent with the country's historical tradition.**

The Second Amendment protects an individual right to keep and bear arms independent of militia service. *District of Columbia v. Heller*, 554 U.S. 570, 583-84 (2008). If "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022). To rebut this presumption, the burden is on the government to show a challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. The test for historical consistency is demanding: The Government must show similar regulations were widespread and commonly accepted in the founding era, when the Second Amendment was adopted. *See id.* at 36 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (Scalia, J., concurring in judgment) (additional citations omitted)).

53

**B. The Second Amendment's "plain text" covers Moore's conduct.**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. Thus, the Amendment covers Moore's conduct of possessing a short-barrel rifle inside his home, as charged in the Indictment.

Moore is part of "the people." As this Court and the Supreme Court have recognized, the Second Amendment applies to "all Americans." *United States v. Rahimi*, 602 U.S. 680, 701-02 (2024); *Heller*, 554 U.S. at 81; *United States v. Jiminez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022). Relatedly, the *Rahimi* Court squarely "reject[ed] the Government's contention" that legislatures can disarm anyone who is not "responsible." 602 U.S. at 701.

Just as Moore is in the class of people protected by the Second Amendment, the short-barrel rifles he possessed are in the class of "arms" protected by the Second Amendment. Even with the NFA's onerous regulatory requirements, the number of short-barrel rifles in circulation has grown over 700% in the last decade. In 2011, there were about 75,000 registered short-barrel rifles across the country. Oliver Krawczyk, *Dangerous and Unusual: How an Expanding National Firearms Act*

*Will Spell Its Own Demise*, 127 Dick. L. Rev. 273, 295 (2022). Ten years later, that number exploded to about 532,000. *Id.*

Despite these numbers, rifles of all types are rarely used to commit crimes. *Cf. Heller v. District of Columbia*, 670 F.3d 1244, 1269-70, 1290 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("[S]emi-automatic *handguns* are used in connection with violent crimes far more than semi-automatic *rifles* are. . . . [I]t is difficult to make the case that semi-automatic rifles are significantly more dangerous than semi-automatic handguns, and the Supreme Court has already held semi-automatic handguns to be constitutionally protected."). Thus, they are "bearable arms" that are "in common use" and are "typically possessed by law-abiding citizens for lawful purposes, and their possession is therefore protected by the Second Amendment." *See Heller*, 554 U.S. at 582, 627.

In denying Moore's motion to dismiss, the district court relied on *United States v. Miller*, 307 U.S. 174 (1939). *Miller* was a five-page opinion with one paragraph of analysis. The opinion issued without adversarial safeguards: Counsel for the defendants did not submit a brief or even appear for oral argument. *See id.* at 175. Moreover, *Miller*'s logic is questionable today, following *Heller*'s holding that

the Second Amendment protects an individual right, not a right dependent on service in a militia. 554 U.S. at 583-84.

But even assuming *Miller* remains valid, it would be "particularly wrongheaded to read *Miller* for more than what it said, because the case did not even purport to be a thorough examination of the Second Amendment." *Heller*, 554 U.S. at 623. And the instant case is distinguishable on two grounds. First, *Miller* involved a short-barrel *shotgun*, not a short-barrel *rifle*. *Miller*, 307 U.S. at 178. Second, the instant case arises in a post-*Heller* world, where the analysis focuses on the weapon's use by an individual, not as a member of the militia. *See Heller*, 554 U.S. at 583-84. And there can be little doubt that short-barrel rifles are useful individual weapons. James A. D'Cruz, *Half-Cocked: The Regulatory Framework of Short-Barrel Firearms*, 40 Harv. J. L. & Pub. Pol'y 493, 504 (2017) (noting that the standard-issue rifle for the United States Army and Marine Corps infantry is an M4 carbine with a 14.5-inch barrel). As the Supreme Court recognized in *Heller*, the sole surviving holding from *Miller* is that the Second Amendment's protections extend "only to certain types of weapons." 554 U.S. at 623. It does not hold that short-barrel rifles specifically are not protected by the Second Amendment.

Because Moore is among "the people" covered by the Second Amendment's plain text and short-barrel rifles are among the covered "arms," the NFA is presumptively unconstitutional. "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and the burden is on the government to show that a law proscribing such conduct is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

## C. The Government cannot show a historical tradition of requiring pre-possession registration of short-barrel rifles.

The ready availability of short-barrel firearms is not a "dramatic technological change" that was "unimaginable at the founding." *Bruen*, 597 U.S. at 28-29. Because the availability of short-barrel firearms is a "general societal problem that has persisted since the 18th century," the government must show a "distinctly similar historical regulation" that addressed the issue, *id.* at 26, rather than a "relevantly similar" historical analogue, *id.* at 29; *see also* The American Revolution Institute, *Blunderbuss, the "Thunder Box" of the Battlefield*, https://www.americanrevolutioninstitute.org/recent-acquisitions/english-blunderbuss/ (last viewed May 29, 2025) ("Few weapons inspire imagination about the sounds of a Revolutionary War battlefield like a blunderbuss. . . . With a

short, large-caliber barrel just shy of fifteen inches and a flared muzzle, the blunderbuss was best for use at short range, to scatter shot or other damaging projectiles.").

The government did not meet its burden of showing a distinctly similar historical regulation to the NFA's provision barring possession of a short-barrel rifle until it has been registered. The NFA therefore violates the Second Amendment. Moore's conviction and sentence should be reversed, and the case should be remanded with instructions to grant Moore's motion to dismiss.

## CONCLUSION

Based upon the argument and authority presented above, Moore respectfully

asks the Court to reverse his conviction and sentence. Alternatively, Moore asks the

Court to remand for hearings on his motion for new trial and his motion to suppress.

Respectfully Submitted,

JOSEPH F. DEBELDER
FEDERAL PUBLIC DEFENDER

*/s Stacey Niles Kime*
STACEY NILES KIME
Assistant Federal Public Defender
Fla. Bar No. 0095211
227 N. Bronough Street, Suite 4200
Tallahassee, FL 32301
(850) 942-8818
(850) 942-8809 Fax
Attorney for Appellant

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

[**X**] this brief contains 11,027 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

[ ] this brief uses a monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[**X**] this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Equity A, 14 point, or

[ ] this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].


/s Stacey Niles Kime
STACEY NILES KIME
Assistant Federal Public Defender
Fla. Bar No. 0095211

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing has been furnished electronically in Acrobat format by Internet upload to this Court and to Assistant United States Attorney Gary Milligan, 21 East Garden Street, Suite 400, Pensacola, Florida 32502, and by U.S. Mail to Jesse Moore, Reg. No. 08015-519, FCI Pekin, Federal Correctional Institution, P.O. Box 5000, Pekin, IL  61555, all on this 16th day of June, 2025.

*/s Stacey Niles Kime*
STACEY NILES KIME
Assistant Federal Public Defender
Fla. Bar No. 0095211